James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150

Howard G. Smith
LAW OFFICES OF HOWARD G. SMITH
3070 Bristol Pike, Suite 112
Bensalem, Pennsylvania 19020
Telephone: (215) 638-4847

*Attorneys for Plaintiff and the proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BIXING PENG, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AGILE THERAPEUTICS, INC., ALFRED ALTOMARI, and ELIZABETH GARNER,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Bixing Peng ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Agile Therapeutics, Inc., ("Agile" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Agile; and (c) review of other publicly available information concerning Agile.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that acquired Agile's securities between March 9, 2016, and January 3, 2017, inclusive (the "Class Period"), against the Defendants, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Agile develops women's healthcare products. The Company's lead product is the Twirla contraceptive patch containing the active ingredients levonorgestrel and ethinyl estradiol.

3.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Twirla contraceptive patch had an efficacy rating below peer group standards; (2) that over half of patients in its "Secure" Phase 3 Study discontinued the study early; (3) that therefore the FDA would likely not approve the Twirla patch marketing application; and (4) that, as a result of the foregoing, Defendants' statements about Agile's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

4.      On January 3, 2017, the Company published a press release announcing top line results from its Phase 3 "Secure" clinical study. According to the Company, the Twirla patch's efficacy measure, known as its "Pearl Index" failed to meet the industry standard for FDA approved contraceptives, as the highest Pearl Index for a hormonal contraceptive product approved by the FDA is 3.19. In addition, the Company announced that 51.4% of patients failed to continue the study to completion.

5.      On this news shares of Agile fell $2.37 per share, or nearly 50%, to close on January 4, 2017 at $2.63 per share, on unusually heavy trading volume.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this Judicial District.

10.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.    Plaintiff Bixing Peng, as set forth in the accompanying certification, incorporated by reference herein, purchased Agile common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.    Defendant Agile is a Delaware Corporation headquartered in Princeton, New Jersey.  Agile's common stock trades on NASDAQ under the symbol "AGRX."

13.    Defendant Alfred Altomari ("Altomari") is and, throughout the Class Period, was the Company's President and Chief Executive Officer.

14.    Defendant Elizabeth Garner ("Garner") is and, throughout the Class Period, was the Company's Chief Medical Officer.

15.    Defendants Altomari and Garner (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Agile's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew

that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

16.    The Class Period begins on March 9, 2016.  On that day the Company published a press release announcing fourth quarter and full year 2015 results. Therein, the Company discussed the success of the SECURE clinical trial: "This past year was a productive one for Agile as we completed enrollment in our SECURE clinical trial and expanded our intellectual property portfolio," said Al Altomari, Chief Executive Officer and President of Agile.  "We have continued our momentum into 2016 by strengthening our cash position through the completion of our common stock offering, and we believe we are now well-positioned to advance Twirla® through the clinic.  We look forward to Twirla becoming the first low-dose combined hormonal contraceptive patch for women."

17.    On March 9, 2016, the Company filed an annual report on Form 10-K with the SEC, and reaffirmed the Company's belief that the SECURE study would support the Twirla FDA marketing application, "believe the clinical trial data from the ongoing Phase 3 trial (SECURE) for Twirla will support our future marketing of Twirla."

18.    The Company continued to address the framework of the SECURE study in its annual report:

The SECURE study, our third Phase 3 Clinical Trial

Our third Phase 3 clinical trial is intended to address a number of issues identified in the CRL, including but not limited to, a simplified trial design, study conduct,

recruitment of study population and compliance. We have designed and are conducting the SECURE study as follows:

• Single-arm study;


• Over 2,000 female subjects will receive Twirla for up to one year;


• Approximately 100 sites located in the United States with experience in conducting contraceptive studies;


• The subjects are using an electronic diary to record the data that are critical to the calculation of the PI, such as sexual activity, back-up contraception use, and patch usage and adhesion; and


•We will assess patch adhesion based on a quantifiable daily subject assessment of percent adherence of the patch to the skin.

By not having a comparator, we will increase the number of cycles collected for the primary efficacy analysis. The single-arm design will also substantially reduce the complexity of statistical analyses required to interpret the results of the trial and will reduce uncertainty around interpretation of any unexpected differences in observed PI values between Twirla and a comparator arm that could occur. Importantly, the simplified protocol design should also be easier for clinical sites to understand and implement. In addition, we believe that having no oral contraceptive comparator will attract subjects who are interested in participating in the transdermal method as opposed to subjects who may be at higher risk for early discontinuation from the study if randomized to the patch. We believe this phenomenon occurred in the larger of our completed Phase 3 clinical trials and may have contributed to the early observed discontinuation rate.

We have engaged Parexel International Corporation, or Parexel, a CRO with substantial experience in contraception studies and excellent site monitoring capabilities, as the CRO for the SECURE study. We actively participated in site selection and in monitoring subject recruitment, and actively participate in site monitoring and oversight of Parexel's activities, and will continue to do so throughout the length of the trial. Our CRO was selected based not only on the above criteria, but on a clear track record of responding to trends and information through early intervention in order to assure compliance with trial procedures at both the subject and site levels.

The SECURE study is employing several measures designed to improve upon one aspect of prior study conduct: loss to follow-up. First, the SECURE study is being

conducted in approximately 100 sites in the United States that have experience conducting contraceptive trials and experienced study coordinators. Study sites have been evaluated extensively for their prior hormonal birth control trial experience through a data-driven approach assessing performance on previous clinical studies, staffing of experienced study coordinators with longevity at the site, demographics of potential study subjects, and audit history. Technology employed by our contract research organization, or CRO, in coordination with our clinical team will enable more focused oversight of participating sites and facilitate more individualized attention to enrolled study subjects, as compared to our previous Phase 3 study. Training of study coordinators at the investigator meeting, at study initiation visits, at coordinator's meetings, and through ongoing communication should also reduce loss to follow-up. In addition, study sites that are showing early trends toward higher rates of loss to follow-up or overall poor study management will be re-trained and, if necessary, discontinued. Upon subject enrollment, sites will also ask for multiple methods of contact for each subject, and will obtain permission to contact family members and utilize public records to locate subjects who are lost to follow-up.

After site selection, recruitment of the study population is the next crucial step toward achievement of a population that will provide reliable and generalizable data in the SECURE study.

19.     On May 9, 2016, the Company published a press release announcing first quarter 2016 results. Therein, the Company discussed the success of the SECURE clinical trial, "We made significant progress during the first quarter of 2016 by improving our cash position through the completion of our common stock offering," said Al Altomari, Chief Executive Officer and President of Agile.  "We continue to execute on the management of our SECURE clinical trial and continue to expect completion of the trial in the fourth quarter of 2016."

20.     On May 9, 2016, the Company filed a quarterly report on Form 10-Q with the SEC, and reaffirmed the Company's belief that the SECURE study would support the Twirla FDA marketing application.

21.     On August 8, 2016, the Company published a press release announcing second quarter 2016 results. Therein, the Company discussed the success of the SECURE clinical trial, "During the first half of this year, we believe we made significant progress on the execution of

our business strategy to build a commercially competitive women's health franchise," stated Al Altomari, President and Chief Executive Officer of Agile. "Our primary focus continues to be on the SECURE trial, which we expect to complete in the fourth quarter of 2016. In addition, with the planned clinical development of our first line extension for Twirla, we believe we will be positioned to expand our market potential."

22.     On August 8, 2016, the Company filed a quarterly report on Form 10-Q with the SEC, and reaffirmed the Company's belief that the SECURE study would support the Twirla FDA marketing application.

23.     On November 7, 2016, the Company published a press release announcing third quarter 2016 results, including the completion of subject visits for Twirla Phase 3 SECURE clinical trial. Therein, the Company discussed the success of the SECURE clinical trial:

> Agile Therapeutics, Inc. (Nasdaq: AGRX), a women's health specialty pharmaceutical company, today announced completion of all final subject visits for its Twirla® Phase 3 SECURE clinical trial, reported financial results for the three and nine months ended September 30, 2016, and provided a corporate update for the third quarter 2016.
>
> "Completion of all subject visits in our SECURE clinical trial is a significant milestone in the development of Twirla," said Elizabeth Garner, M.D., M.P.H., Chief Medical Officer of Agile. "We can now move forward with data verification and database lock activities, which we anticipate being completed by the end of December 2016. We will then proceed with initial data analysis and expect to announce top-line data in early January 2017. We believe we have conducted a well-run trial focused on quality and the key metrics the U.S. Food and Drug Administration (FDA) has indicated would be most important in their assessment of SECURE. We look forward to submitting a comprehensive package of reliable data that we believe can respond to the FDA's questions as well as establish the safety and efficacy profile for Twirla. We would like to thank our investigators and their staff, our partners and, most importantly, the women who participated in SECURE for helping us conduct such a rigorous study."
>
> SECURE is a multicenter, single-arm, open-label Phase 3 clinical trial evaluating the safety, efficacy and tolerability of Twirla in 2032 healthy women aged 18 and over at 102 experienced investigative sites across the United States. The clinical trial was designed in consultation with the FDA in response to their 2013

complete response letter (CRL). The FDA recommended that the Company conduct a clinical trial that would address prior conduct and quality issues and demonstrate efficacy as measured by an acceptable pearl index and related confidence interval in a representative sample of U.S. women with respect to key demographic criteria including contraceptive user status, age, race, ethnicity, and body mass index (BMI). Twirla contains the active ingredients ethinyl estradiol and levonorgestrel, both of which have an established history of efficacy and safety in currently marketed low-dose combination oral contraceptives. The patch is intended to be applied once weekly for three weeks followed by a patch-free week, and is designed to promote user compliance.

• • •

"With the anticipated conclusion of our SECURE clinical trial, we will now increase our focus on the resubmission process," stated Al Altomari, Chairman and Chief Executive Officer of Agile. "We look forward to continuing our dialogue with the FDA as we prepare our CRL response and NDA resubmission, which is planned for the first half of 2017. We believe that making Twirla commercially available will begin to fill a strong need for innovative products in women's health."

24.     On November 7, 2016, the Company filed a quarterly report on Form 10-Q with the SEC, and reaffirmed the Company's belief that the SECURE study would support the Twirla FDA marketing application.

25.     The above statements identified in ¶¶16-24 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose: (1) that the Twirla contraceptive patch had an efficacy rating below peer group standards; (2) that over half of patients in its "Secure" Phase 3 Study discontinued the study early; (3) that therefore the FDA would likely not approve the Twirla patch marketing application; and (4) that, as a result of the foregoing, Defendants' statements about Agile's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

26.     On January 3, 2017, the Company published a press release announcing top line

results from its Phase 3 "Secure" clinical study. According to the Company, the Twirla patch's efficacy measure, known as its "Pearl Index" was 4.80. And, therefore, Twirla's Pearl Index failed to meet the industry standard for FDA approved contraceptives, as the highest Pearl Index for a hormonal contraceptive product approved by the FDA is 3.19. In addition, the Company announced that 51.4% of patients failed to continue the study to completion.

27.     On this news shares of Agile fell $2.37 per share, or nearly 50%, to close on January 4, 2017 at $2.63 per share.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Agile's securities between March 9, 2016, and January 3, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Agile's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Agile shares were traded publicly during the Class Period on the NASDAQ. As of November 4, 2016, Agile had 28,757,719   shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Agile or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Agile; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

34.     The market for Agile's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Agile's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Agile's securities relying upon the integrity of the market price of the Company's securities and market information relating to Agile, and have been damaged thereby.

35.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Agile's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Agile's business, operations, and prospects as alleged herein.

36.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Agile's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at

artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

37.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

38.     During the Class Period, Plaintiff and the Class purchased Agile's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Agile, their control over, and/or receipt and/or modification of Agile's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Agile, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

40.     The market for Agile's securities was open, well-developed and efficient at all

relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Agile's securities traded at artificially inflated prices during the Class Period. On June 2, 2016, the Company's stock price closed at a Class Period high of $8.27 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Agile's securities and market information relating to Agile, and have been damaged thereby.

41.    During the Class Period, the artificial inflation of Agile's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Agile's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Agile and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

42.    At all relevant times, the market for Agile's securities was an efficient market for the following reasons, among others:

(a)    Agile stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Agile filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Agile regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Agile was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

43.    As a result of the foregoing, the market for Agile's securities promptly digested current information regarding Agile from all publicly available sources and reflected such information in Agile's stock price. Under these circumstances, all purchasers of Agile's securities during the Class Period suffered similar injury through their purchase of Agile's securities at artificially inflated prices and a presumption of reliance applies.

44.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Agile who knew that the statement was false when made.

**FIRST COUNT**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

46.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Agile's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each

defendant, took the actions set forth herein.

48.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Agile's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Agile's financial well-being and prospects, as specified herein.

50.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Agile's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Agile and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

51.    Each of the Individual Defendants' primary liability and controlling person

liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

52.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Agile's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53.    As a result of the dissemination of the materially false and/or misleading

information and/or failure to disclose material facts, as set forth above, the market price of Agile's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Agile's securities during the Class Period at artificially high prices and were damaged thereby.

54.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Agile was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Agile securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND COUNT**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

57.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.    Individual Defendants acted as controlling persons of Agile within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.    As set forth above, Agile and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the

Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

<br>

|  | /s/ James E. Cecchi |
|---|---|
| Dated: January 6, 2017 | James E. Cecchi |

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150

Howard G. Smith
LAW OFFICES OF HOWARD G. SMITH
3070 Bristol Pike, Suite 112
Bensalem, Pennsylvania 19020
Telephone: (215) 638-4847

*Attorneys for Plaintiff and the proposed Class*